ANN BIRMINGHAM SCHEEL
Acting United States Attorney
District of Arizona

KEVIN M. RAPP
Assistant U.S. Attorney
Arizona State Bar No. 014249
Kevin.Rapp@usdoj.gov

MONICA B. KLAPPER
Assistant U.S. Attorney
Arizona State Bar No.013755
Monica.Klapper@usdoj.gov

Two Renaissance Square
40 North Central Avenue, Suite
Phoenix, Arizona 85004
Telephone (602) 514-7500

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>                    Plaintiff,<br><br>          v.<br><br>Paige Kinney,<br><br>                    Defendant. | CR 10-796-01-PHX-NVW<br><br>Related Case CR 11-491-PHX-NVW<br><br>**UNITED STATES' SENTENCING MEMORANDUM IN CR 10-796-01-PHX-NVW AND CR 11-491-PHX-NVW**<br><br>(Sentencing March 7, 2012 @ 9:30) |

The United States of America submits sentencing recommendations in CR 10-796-01-PHX-NVW and in companion case CR 11-491-PHX-NVW. As more fully explained below, the United States recommends that the defendant be sentenced to 120 months in CR 10-796-01-PHX-NVW and 60 months in CR 11-491-PHX-NVW, to be served consecutively. The United States further recommends restitution in CR 10-796-01-PHX-NVW in the amount of $22,790,982 and in CR 11-491-PHX-NVW in the amount of $90,780.29.

Respectfully submitted this 2nd day of March, 2012.

ANN BIRMINGHAM SCHEEL
Acting United States Attorney
District of Arizona

s/Kevin M. Rapp
KEVIN M. RAPP
MONICA B. KLAPPER
Assistant U.S. Attorneys

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.      Factual Background: CR 10-796-01-PHX-NVW and CR 11-491-PHX-NVW**

On June 11, 2008, the Grand Jury indicted Defendants Kinney and Matheson in CR 10-796-PHX-NVW ("case one") in a 25 count Indictment charging them with Conspiracy to Commit Wire Fraud, Wire Fraud, Money Laundering, and Conspiracy to Commit Money Laundering in violation of 18 U.S.C. §§ 1349, 1341, 1957, and 1957(h).  Since then, both have pleaded guilty. Defendant Kinney has pled to one count of Conspiracy to Commit Wire Fraud and one count of Conspiracy to Commit Money Laundering. In February 2011, the Grand Jury indicted Defendant Kinney in CR 11-491-PHX-NVW ("case two") in a 50 count indictment charging her with Wire Fraud, Mail Fraud, Bank Fraud, and Bankruptcy Fraud, in violation of 18 U.S.C. §§ 1341, 1343, 1344 and 152. Defendant Kinney pled guilty in case two to two counts of Bankruptcy Fraud, two counts of False Declarations in Bankruptcy Proceedings, six counts of Mail Fraud and one count of Bank Fraud

As detailed in the Indictment and the factual basis to Defendant Kinney's plea agreement in case one, from January 2005 through December 2007, operating through several companies, including Maricopa Property Investment Solutions and Valuable Home Solutions, Defendants Kinney and Matheson and their co-conspirators directed others to purchase homes for the purpose of rehabilitating the homes and reselling the homes for profit. In order to purchase the homes Kinney, as the loan officer, originated numerous loans, with loan applications and supporting documents that contained false information. Kinney prepared loan applications on behalf of "straw buyers" that contained false information regarding the buyers' assets, income, liabilities and their intent to reside in the home as their primary residence. Kinney also supported the loan applications with documents that had been altered, including bank statements that falsely represented the assets of the buyer. Additionally, in some instances, Kinney prepared letters of explanation that falsely represented certain material facts regarding the applicants' assets or income.

Defendants Kinney and Matheson and their co-conspirators, among other criminal conduct, committed the following acts in furtherance of the scheme: (1) paid between $10,000 and $60,000 to each of the straw buyers to participate in the scheme; (2) obtained fraudulently inflated loans on the properties in the straw buyers' names; (3) falsified loan applications for unqualified straw buyers and submitted those applications to lenders to obtain mortgages on residential properties; (4) provided fraudulent and forged asset, income and employment verification forms to lenders to obtain mortgages; (5) forged straw buyers' signatures on closing and other loan documentation; (6) stripped away the bulk of the homeowners' equity proceeds and converted that money to their own personal use; (7) stopped making the mortgage payments on the homes, resulting in the homes being foreclosed upon, which led to millions of dollars in losses to the lenders on the underlying fraudulent loans.  Defendant Kinney used over a million dollars in earnings and stolen equity proceeds from the scheme to pay for personal expenses including cars, clothes, luxury homes, a San Diego beach condominium, international trips, jewelry, ATVs, and home furnishings.

A further investigation of Defendant Kinney determined that she was engaged in several other frauds. As detailed in the case two Indictment and the factual basis in her plea, Defendant Kinney had engaged in the following schemes to defraud: (1) while employed at mortgage company PRMI she submitted false invoices for fictitious mortgage leads and was paid $122,399.46; (2) she submitted a false insurance claim for property that she alleged was stolen from her residence in a staged burglary and was paid $122,112.79; (3) she conspired with two friends, Pamela Willoughby and Shauna Brauchler, to fraudulently sell Brauchler's vehicle to Willoughby knowing that the vehicle never changed hands and did so to obtain $35,000 for Kinney's benefit; (4) she filed for bankruptcy under the name JaimeLee Lawler when in fact she had changed her name to Paige Kinney and then she fraudulently omitted assets and liabilities that were in the name of Paige Kinney.

/

/

## II.     Applicable Law

Following *United States v. Booker*, 543 U.S. 220 (2005), imposing a sentence under the advisory Guidelines is a multi-step process.  *See United States v. Moreland*, 437 F.3d 424 (4th Cir. 2006).  The sentencing court must initially determine, after making appropriate findings of fact, the applicable Guideline range.  The advisory Sentencing Guidelines promote the "basic aim" of Congress in enacting the Sentencing Reform Act, namely, "ensuring similar sentences for those who have committed similar crimes in similar ways." *Booker*, 543 U.S. at 252.  In furtherance of that goal, a sentencing court is required to "consider the Guidelines 'sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant,' the pertinent Sentencing Commission policy statements, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to victims." *Id*. at 260 (citations omitted).

Under the procedure outlined in *Gall v. United States*, 128 S.Ct. 586, 596-97 (2007), the court must undertake an individualized assessment of the facts of each case in light of the factors delineated in 3553(a).  The Supreme Court recognizes that "[t]he sentencing judge has access to, and greater familiarity with, the individual case and the individual defendant before him than the [United States Sentencing] Commission or the appeals court." *Rita v. United States*, 551 U.S. 338, 356 (2007).  Accordingly, "while the statute still requires a court to give respectful consideration to the Guidelines, *Booker* permits the court to tailor the sentence in light of other statutory concerns as well." *Kimbrough v. United States*, 128 S.Ct. 558, 569-70 (2007) (citations and quotation omitted).

Section 3553(a) directs the Court to impose a sentence "sufficient, but not greater than necessary" to comply with the purposes set forth in paragraph two:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner.

Section 3553(a) further directs the Court – in determining the particular sentence to impose – to consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the statutory purposes noted above; (3) the kinds of sentences available; (4) the kinds of sentences and the sentencing range as set forth in the Sentencing Guidelines; (5) the Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense. *See* 18 U.S.C. § 3553(a).  The court must select a sentence in light of these factors and all other factors under Section 3553(a)(1), and must adequately explain the rationale for its sentence. *Gall*, 128 S.Ct. at 597.  If the sentencing court, after considering all of these factors, chooses to vary outside the advisory Guideline range, such a variance must be supported by a rationale sufficiently compelling to support the extent of the deviation. *Id*.

**III**.   **Analysis**

As discussed below, the United States respectfully submits that application of the sentencing factors to Defendant Kinney's conduct –in both cases– at a minimum, calls for a substantial Guidelines sentence and should include a term of years of imprisonment that would forcefully provide just punishment for these offenses, promote general deterrence against the various frauds that she engaged in, and protect the public from further criminal activity by Defendant Kinney.

**A.**         ***The Nature and Circumstances of the Offense*s**

The nature and circumstances of the offenses in both case one and two are unique and especially disturbing.  The length, scope, and sheer number of fraudulent transactions involved in both cases are extraordinary and reveal Defendant's relentless dedication to committing a variety of frauds for her own personal gain.  The consequential effects on the victims of Defendant's crimes cannot be overstated and has been described in both presentence reports. Kinney engaged in several sophisticated criminal schemes involving fraudulent business transactions and claims, the movement and concealment of assets and liabilities, the concealment of her true identity, and misrepresentations to a federal Bankruptcy Court.  In case one, 43

representative properties were involved in the scheme described in the Indictment. (*See* Exhibit A.)  The straw buyers, many of whom were unknowing accomplices, were negatively impacted as the homes eventually went into foreclosure impacting their credit scores.  The lenders sustained substantial losses due to the inability of the buyers to make payments.   Moreover, the homeowners who lived in close proximity to the subject properties had their property values depreciate as a result of Defendant Kinney's fraud.

During the investigation, the IRS and FBI examined Defendant Kinney's bank accounts and credit card statements, and prepared a financial analysis of the money flowing from the lenders to Defendant and the outflows to cash and personal expenses of Defendant. The vast majority of Defendant's proceeds from the fraud were spent on personal items. At the time of her arrest and search warrant related to case two, Defendant was residing in a luxury custom built hilltop home worth in excess of $1,000,000.  (*See* exhibit B.)  This home was leveraged with liens far beyond its market value. During the life of the conspiracy, Kinney possessed numerous vehicles, including luxury vehicles, she purchased numerous ATVs, luxury watches , jewelry and a  boat. (*See* Exhibit C.)  She had a vacation home in San Diego also valued in excess $1,000,000 but similarly over leveraged with liens. (*See* Exhibit D.)  Her personal expenses included beauty salons, high end hotels, trips to both Costa Rica and San Diego, and furnishings for her two properties in Phoenix and San Diego.  All of this was accomplished without any substantial legitimate means of support. In the end, Defendant Kinney sustained her lifestyle with the use of credit cards with extraordinary high balances, fraudulently obtained money and compensation from the "cash back" scheme in case one, credit lines, the money received from fraudulent invoices submitted to PRMI, the proceeds from the insurance fraud perpetrated on Allstate Insurance Company, and the money obtained from the fraudulent sale of Shauna Brauchler's Mercedes financed by Credit Union West.

**B.**          ***History and Characteristics of the Defendant***

Defendant Kinney blatantly and repeatedly lied and violated the trust of lenders, banks, property buyers, employers, an insurance company,  the federal Bankruptcy Court and her friends.

Defendant has a long history of deceit and concealment dating back to 1992. Her first federal felony conviction involved fraud. (*See* PSR ¶ 38.)  Moreover, the two current cases do not represent  the first time that she changed her name to conceal her identity from employers, law enforcement and others. Shortly after release from prison in 1992, she changed her name from Sheri Ann Lawler to JaimeLee Lawler.  She has used corporate entities and nominees to conceal her business transactions from the government and employers.  Kinney is associated with at least three aliases, identified in the Indictment, which she has used at various times and for various purposes to further her illicit schemes.

During the course of the Government's investigation, witnesses have informed the Government that Defendant approached them about the investigation and appeared to be coaching them on how to respond to investigators.  Once Defendant learned that she was under investigation for mortgage fraud she attempted to cooperate with authorities but instead lied to the United States about her role in the scheme.   Thus, in the face of a federal investigation into her conduct, Defendant resorted to obstruction and lies.

With respect to her patent disrespect for law and basic ethical conduct, the duration and breadth of Defendant's criminal conduct speaks volumes.  Her crimes were not a one-time event arising, for example, from a split-second decision made under financial duress.  Rather, these crimes were the product of a series of deliberate decisions made over the course of years, and it was within her  power to stop her crimes at any point in time. She chose not to do so.  At some point Defendant chose to abandon honest work to pursue riches and an unsustainable lavish lifestyle through crime, and she used the proceeds of those crimes to enjoy a lifestyle at the expense of financial institutions, employers and friends.  White collar criminals often commit crimes that are "more rational, cool, and calculated than sudden crimes of passion or opportunity."  *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006).  In the final analysis, the  nature of Defendant's crimes calls for a harsh prison sentence.

/

/

1

**C.**          *The Need to Afford Adequate Deterrence*

2      Under Section 3553(a), the need for the sentence to "afford adequate deterrence to

3   criminal conduct" must also be considered.   18 U.S.C. § 3553(a)(2)(B).   The enormity and

4   audacity of Defendant's crimes has understandably captured the attention of members of the

5   Arizona mortgage and banking industry.   Thus, the deterrent message and effect of the sentence

6   imposed by the Court in this case will resonate significantly with any individual or institution

7   tempted to engage in conduct similar to that of Defendant.   This need for deterrence is especially

8   important for local mortgage brokers, individuals tempted to make false insurance claims, those

9   who embezzle from employers and those who file for bankruptcy. The Government further

10  respectfully submits that the Court should consider that Kinney committed the conduct in case

11  two *after* the prosecution of numerous well-publicized mortgage fraud schemes and pending trial

12  for her own mortgage fraud scheme.   A term of 120 months for the mortgage fraud scheme in

13  case one and a consecutive sentence of 60 months in case two– resulting in a total of 15 years

14  imprisonment– should reinforce the deterrent message conveyed by any prior mortgage fraud

15  sentences and the series of frauds committed in case two.

16

**D.**          *The Need to Avoid Unwarranted Sentence Disparities*

17     Under 18 U.S.C. § 3553(a)(7), the Court should consider the "need to avoid unwarranted

18  sentencing disparities."   Here, Defendant is   not similarly situated to her co-conspirators

19  (Matheson and Rayman).   Both Matheson and Rayman engaged in early and protracted

20  cooperation. A sentencing disparity based on cooperation with the government is not

21  unreasonable.  *Carter*, 560 F.3d at 1121; *United States v. Haley*, 529 F.3d 1308, 1312 (10th Cir.

22  2008) (assisting the government does not create an unwarranted disparity under § 3553(a)(6));

23  *United States v. Lopez*, 283 Fed. Appx. 986 (3d Cir. 2008) (holding that the district court was

24  reasonable in sentencing defendant much more harshly than co-defendants for similar offense

25  because defendant did not cooperate).   Each of her co-conspirators pleaded guilty either prior to

26  indictment (Rayman) or shortly after arrest (Matheson) and eased the prosecution considerably.

27  As the top organizer, leader, the one with a specialized skill as a loan officer, and the one who

28

8

profited the most, Defendant's Guidelines reflect her role and the benefits in the overall scheme. As noted above, Defendant Kinney, like Matheson and Rayman, had the opportunity to cooperate, but instead lied to investigators. Accordingly, the sentence requested by the Government would not generate a cognizable disparity with co-defendants.

With respect to other mortgage fraud Defendants engaged in cash back schemes, prosecuted in the District of Arizona, Defendant's sentence is in parity with the leaders of those conspiracies who did not cooperate but pleaded guilty.[1] However, similar mortgage fraud cases nationwide have had resulted in very lengthy sentences.[2] Although a sentence of 120 months would be the lengthiest sentence to date in the District of Arizona– for a cash back scheme where a defendant entered a guilty plea– it is appropriate given the magnitude of Defendant's fraud. First, to date, a scheme involving nearly sixty properties is larger than any previously prosecuted "cash back" case. *Id.* Although Kinney may not have the criminal history that some of the leaders had in other similar cases, those who received lengthy sentences did not have the specialized skill of a loan officer possessed by Defendant.[3] Accordingly, the recommended sentence for both case one and two does not create an unwarranted sentencing disparity.

## IV.   Defendant received a Favorable Plea Agreement

Defendant pleaded guilty well in advance of the trials in both cases, saving the United States substantial expense and time to prepare for trial. In exchange, Defendant received favorable stipulations.

### A.   *Loss Stipulation*

---

[1]   Exhibit E is a spreadsheet that details the sentences imposed for similar "cash back" schemes prosecuted in the District of Arizona since 2008. The chart sets forth a series of objective factors, including the number of properties involved in the scheme, the loss attributable to a defendant, criminal history score, whether defendant cooperated and the sentence imposed.

[2]   Exhibit F is a summary of lengthy sentences imposed for mortgage fraud cases nationwide.

[3]   *See Sharpe* CR 07-00544-PHX-ROS, *Bernadel* CR-08-00256-PHX-GMS, and *Nero* CR-08-0744-TUC-CKJ.

1    Defendant received a stipulation to loss that inures to her benefit.  The investigation details
2    losses that exceed $20,000,000. (*See* Exhibit A.)   The government used a methodology of
3    calculating losses by subtracting the first post-foreclosure sales price of the properties from the
4    amount of the original loans. A finding of loss between $20,000,000 and $50,000,000 would
5    result in a 22 level increase from a base offense level of 7. (PSR ¶ 26.) Because this is a
6    substantial enhancement due process likely requires the United States to prove the enhancements
7    by "clear and convincing evidence" because such an increase would have an "extremely
8    disproportionate effect" on the sentence.  *United States v. Pike*, 473 F.3d 1053, 1057 (9th Cir.
9    2007).

10    Such a standard would require a protracted and complicated hearing that would delve into
11    what the loss was at the time of the fraud, rather than at some later point in time. *United States*
12    *v. Crandall*, 525 F.3d 907 (9th Cir. 2008). The losses would have to be adjusted for any payments
13    that were made to lenders during the conspiracy. *United States v. Allison*, 86 F.3d 940, 943 (9th
14    Cir. 1996). It also avoids a hearing on the money that any successor lender paid to the original
15    lender thus mitigating the loss. *United States v. James*, 592 F. 3d 1109 (10th Cir. 2010).
16    Moreover, litigation is avoided by the loss stipulation on whether successor lenders' losses were
17    reasonably foreseeable to Defendant or whether losses were market driven. In sum, the parties
18    have agreed that the United States could prove by a clear and convincing standard that Defendant
19    is responsible for a loss of between $2,500,000 and $7,000,000. Accordingly, the United States
20    urges the court to accept this stipulation.

21    **B.**        ***Cap of 120 Months in Case One***

22    The parties have agreed that the Defendant will not receive a sentence of more than 120
23    months in case one. This stipulation takes into account that such a sentence does  not exceed any
24    prior sentence meted out in similar cash back mortgage fraud cases where a defendant timely
25    entered a plea well in advance of trial. Moreover, it recognizes that the range of 168 to 210
26    months (16 to 17.5 years) may be a circumstance where the guideline substantially overstates the

27

28

10

seriousness of the offense. U.S.S.G. §2B1.1 (b)(19)(C).  In such cases, a downward departure may be warranted. *Id.*; *see also United States v. Jackson*, 346 F.3d 2 (9th Cir. 2003).

**V.    The Sentence in Case One  Should Run Consecutive to the Sentence imposed in Case Two**

Sentencing Guideline § 3D1.1(a) sets forth an overview of how district courts must determine  offense level when a defendant, such as Defendant,  is convicted of multiple offenses:

(1) Group the counts resulting in conviction into distinct Groups of Close Related Counts ("Groups") by applying the rules specified in § 3D1.2.

(2) Determine the offense level applicable to each Group by applying the rules specified in § 3D1.3.

(3) Determine the combined offense level applicable to all Groups taken together by applying the rules specified in § 3D1.4.

In turn, U.S.S.G. § 3D1.2 explains how to determine whether counts are "closely related":

All counts involving substantially the same harm shall be grouped together into a single Group. Counts involve substantially the same harm within the meaning of this rule:

(a) When counts involve the same victim and the same act or transaction.

(b) When counts involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan.

(c) When one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts.

(d) When the offense level is determined largely on the basis of the total amount of harm or loss ... or if the offense behavior is ongoing or continuous in nature and the offense guideline is written to cover such behavior.

A Group may consist of a single count; conversely, under appropriate circumstances, all counts may comprise a single Group. U.S.S.G. § 3D1.2, cmt. n. 7.

Here, the offenses in case one involved entirely different victims than the offenses in case two: in case one, the victims were the institutions that Kinney originated loans containing false

11

information, while in case two the victims were mortgage company PRMI (a mortgage company not implicated in case one), Allstate Insurance Company, Credit Union West and the Bankruptcy Court.  Thus, the case one and case two offenses are not "closely related" under U.S.S.G. § 3D1.2(a) (same victim, same act or transaction) or § 3D1.2(b) (same victim, multiple acts or transactions that are part of a common scheme or served a common objective).

Defendant's case one offenses are not "closely related" to her case two offenses under the standard set forth in U.S.S.G. § 3D1.2(d) "[w]hen the offense level is determined largely on the basis of the total amount of harm or loss . . . or if the offense behavior is ongoing or continuous in nature and the offense guideline is written to cover such behavior." Application Note 6 provides that counts involving offenses to which different Guidelines apply are grouped together under subsection (d) if the offenses are of the same general type and otherwise meet the criteria for grouping under this subsection. Here, Defendant Kinney's wire fraud and money laundering in case one did not contribute to the same harm or loss as the mail fraud, wire fraud, bank fraud, and bankruptcy fraud she committed in case two.

In sum, there is no connection between the conduct, co-conspirators and victims in case one. The conduct in both cases is distinct and unconnected. In other words, case one and case two are separate prosecutions, separate indictments, and separate offenses; therefore, the sentences should run consecutively.

## VI.   United States' Sentencing Recommendation

Before the court is a 42-year old female who has resided in Arizona since 1998. Defendant was convicted of a federal felony for fraud nearly twenty years ago that was strikingly similar to the instant case, namely, using a false identity, involving fraud and deceit, obtaining money for her own benefit, etc.  She gravitated to the mortgage loan origination industry and was attracted by the lure of "easy money" prevalent in the real estate industry during 2005-2007.  In the end, her actions in case one caused losses to lenders of the subject properties and depreciated the property values of homes in close proximity to the properties implicated in the scheme.

12

By itself  the breadth and magnitude of the fraud in case one warrants a lengthy prison sentence. What is of grave concern to the United States, however, is that Defendant was undaunted by the indictment in case one.  Following arraignment on case one and while on pretrial release, she engaged in numerous unrelated frauds. She systematically changed her name and ensured that her name change was under seal to avoid detection.  She moved assets from her name JaimeLee Lawler to her "new" name, Paige Kinney. When she was unable to obtain money by originating fraudulent loans for straw buyers she resorted to stealing money from her employer by submitting false invoices for a fictitious company that provided mortgage leads. When that fraud ran its course and she was terminated by PRMI, she staged a burglary of her home to fraudulently obtain insurance proceeds. Once she had spent that money she convinced friends to enter into a sham sale of a Mercedes so that she could obtain the financing for her own use. All the while she was attempting to protect her assets and homes by staving off her creditors by lying to the bankruptcy court about her name and assets.  These actions demonstrate that Defendant is more than simply one of numerous loan officers that exploited the lending standards during the real estate bubble, instead she is a serious economic danger to the community and only a lengthy sentence of 15 years will protect and deter her from further fraud.  Her deliberate and relentless actions are chilling, set her apart from the typical fraudster, and are suggestive of someone with an antisocial personality disorder or sociopathic tendencies.[4]  Accordingly the United States

---

[4]    The Diagnostic and Statistical Manual of Mental Disorders, fourth edition (DSM IV-TR), defines antisocial personality disorder (in Axis II Cluster B) as:[1]

A) There is a pervasive pattern of disregard for and violation of the rights of others occurring since age 15 years, as indicated by three or more of the following:

I.   **failure to conform to social norms with respect to lawful behaviors as indicated by repeatedly performing acts that are grounds for arrest** [emphasis added];

**deception, as indicated by repeatedly lying, use of aliases, or conning others for personal profit or pleasure** [emphasis added];
impulsiveness or failure to plan ahead;

irritability and aggressiveness, as indicated by repeated physical fights or assaults;

(continued...)

13

strongly recommends that the Court sentence the Defendant in case one to the maximum allowable under the plea to ten years and a consecutive five year sentence in case two.

Respectfully submitted this 2nd day of March, 2012.

ANN BIRMINGHAM SCHEEL
Acting United States Attorney
District of Arizona

s/Kevin M. Rapp
KEVIN M. RAPP
MONICA B. KLAPPER
Assistant U.S. Attorneys

## CERTIFICATE OF SERVICE

I hereby certify that on March 2, 2012, I electronically transmitted the attached document to the clerk's office using the CM/ECF System for filing documents and sent the attached document to the following CM/ECF registrants: Larry Debus and Candace Kent, attorneys for Defendant Kinney.

---

[4] (...continued)
    II.   reckless disregard for safety of self or others;

    **III. consistent irresponsibility, as indicated by repeated failure to sustain consistent work behavior or honor financial obligations** [emphasis added];

    **IV. lack of remorse, as indicated by being indifferent to or rationalizing having hurt, mistreated, or stolen from another** [emphasis added];

    B) The individual is at least age 18 years.

    C) There is evidence of conduct disorder with onset before age 15 years.